**Ex Parte Narciso C. LOPEZ, Relator.**

No. 04–85–00155–CV.

Court of Appeals of Texas,
San Antonio.

April 30, 1986.

Concurring and Dissenting Opinion
May 7, 1986.

John D. Wennermark, San Antonio, for appellant.

Morris Collins, San Antonio, for appellee.

Before CADENA, C.J., and REEVES and TIJERINA, JJ.

## OPINION

*On Relator's Application for Writ of Habeas Corpus*

CADENA, Chief Justice.

When relator, Narciso C. Lopez, was divorced from his former wife on April 11, 1977, he was ordered to pay child support in the amount of $150.00 per month. In 1985 he was held in contempt for failure to make such payments and was committed to jail for 30 days "and for such time thereafter until the sum of $6,276... [amount of arrearages] and $306.50 costs is fully paid." In this original application for writ of habeas corpus relator seeks to be discharged from custody because (1) he, although indigent, was not afforded the assistance of counsel; (2) he was not given a jury trial; and (3) he is unable to make the payments for child support.

At the commencement of the contempt hearing, Gale O. Castillo, Esquire, an attorney who was present in the courtroom, told the court that he was representing relator's mother, but not relator. He added that he had told relator that it was his (Mr. Castillo's) "impression" that relator's mother "could raise a few hundred dollars, but not thousands of dollars and it may not be enough to satisfy the court." The court said, "Well, we're here on the motion for contempt. Let's just move on."

After the complainant had testified on direct examination, the court asked relator if he was going to act as his own attorney. He answered, "Yes, ma'am." The judge told relator that he could ask questions of the witness but that it was not the time for him to testify. The court told relator that if he wanted to ask any questions, "this is

the time to do that." Relator replied, "O.K. You want me to ask her questions?" The court answered, "If you have any questions." When relator said, "Can I just tell you . . .," the judge broke in and repeated that if relator wanted to testify he would be given that opportunity later, but that if he had any questions he should ask them at that time.

Relator then said that when "they brought [him] down from the second floor of the jail" he had some "papers" reflecting loans totaling $2,300 which he had obtained for his former wife and which he had to pay. He did not have the documents in the courtroom because jail personnel had told him that he was just "going down to the office." The judge asked relator if he wanted to ask his former wife "if that's correct." Relator answered "Uh-huh, I guess." The former wife said she did not know what relator was talking about, but added that the loans in question had been obtained during the marriage and were outstanding. The court then asked the witness other questions, none of which were suggested by relator.

In answer to the court's inquiry as to whether he had other questions, relator said he had "check stubs." The court said, "Just questions. You will have a chance to testify. Do you have any questions you want to ask her?" When relator failed to respond the court told the witness to "step down."

The court told relator that if he wanted to testify he should have a seat and "just tell us your side of this." After he was sworn, relator testified that:

1. Two weeks after the divorce in 1977, his former wife told him to "come back home because the kids needed" him. He returned to the home and he and the former wife lived together for about two years. During this period they had another child and bought a house.

2. The complainant "got mad" at him and told him she could put "his butt in jail anytime she wanted to." She told him, "Get out of here," and said she was going to "call the cops." He left the house because if he "got in trouble" he would lose

his job with the Bexar county Sheriff's Department. Nevertheless, "She went and filed on" him.

3. When he "went to court" he told the judge that they had bought a house. The judge told him that he was not in court "because of the house" but "because she says you didn't give her any money." He answered he did not think it was fair because he was no longer living in the house and he was giving her what he could.

4. He knows the law is complicated, but he doesn't have enough money "to hire an attorney and sue her back 'cause I don't have time to be messing around in court.'" He lost his job with the office of the U.S. Marshall. When he received a subpoena the Marshall told him that "it would be better" if he resigned. He had not been working since December.

5. When he remarried, his former wife went to his home and "cussed out" his second wife. He would not mind spending six months in jail if that would "clear up" the $6,000, but he knew his being incarcerated would not have that result. He would start paying child support again when he found employment.

6. When he received notice in Brownsville to appear for the contempt hearing in San Antonio he had no money for the trip to San Antonio, so he "just waited til they" picked him up.

7. Until 1980 he worked for the sheriff in Bexar County. He lost that job when "she brought" him to court, and he could not make any further payments.

8. He admitted he owed the money but said he was unable to pay it.

At this point, opposing counsel broke in to say that he did not mind listening to relator's story, but that relator's testimony had "nothing to do" with the contempt hearing. If this was an objection, the court did not rule on it, but asked relator if he had anything else to say. He answered in the negative and was excused, at which point opposing counsel announced, "We rest and close." In answer to the court's

question, relator said he had nothing else to present.

The judge then announced that she found that relator was in contempt of court and committed him to jail for ten days and "until he paid the arrears." The court added that it did not appear that relator could "come up" with the full amount of the arrears, but that if "he is able to come up with a substantial amount of money" the court would consider releasing him. Relator's request that he be allowed to ask a question was ignored.

After the judge announced that she had no objection to "his talking with his mother before he" went to jail, Mr. Castillo, the attorney who had previously announced that he was representing relator's mother, announced that he had been retained by the mother "for the purpose of reviewing this," and that he was going to check some points of law "as to the fact that they were together again as man and wife and produced a child and if that has any bearing as to the arrearages." The judge then announced that the court was in recess.

At no time did relator request an attorney or ask that counsel be appointed to represent him.

As early as 1925 the Supreme Court of the United States recognized that a person charged with contempt which was not committed in the presence of the court was entitled to assistance of counsel, "if requested." *Cooke v. United States,* 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925). The *Cooke* holding "represents the law of" Texas. *Ex parte Hiester,* 572 S.W.2d 300, 302 (Tex.1978).

▆ In this case, while relator did not request the assistance of counsel, the record establishes that the trial court was aware that he was without funds. There is nothing in the record which supports the conclusion that he intentionally and intelligently waived the right to assistance of counsel.

The Sixth Amendment to the United States Constitution provides that the accused shall have the right to assistance of counsel "[i]n all criminal prosecutions." Absent a showing of "knowing and intelli-

gent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor or felony, unless he was represented by counsel at his trial." *Argersinger v. Hamlin,* 407 U.S. 25, 37, 92 S.Ct. 2006, 2012, 32 L.Ed.2d 530 (1972). Despite some early confusion, it now appears settled that *Argersinger* does not require the assistance of counsel whenever a defendant is charged with any criminal offense for which the law prescribes imprisonment as a possible punishment. *Argersinger* merely means that a defendant may not be imprisoned if he was not represented by counsel. *Scott v. Illinois,* 440 U.S. 367, 373–74, 99 S.Ct. 1158, 1161–62, 59 L.Ed.2d 383 (1979).

It cannot be categorically said that *Argersinger* made the right to counsel applicable in all cases in which a person is imprisoned, without reference to whether the proceeding resulting in imprisonment is civil or criminal. Although the opinion refers to "any offense," this is immediately followed by the statement, "whether classified as petty, misdemeanor, or felony," which refers to categories of criminal offenses. This, plus the fact that the court was construing the Sixth Amendment which, by its express language is limited to "criminal prosecutions," strongly suggests, if it does not compel the conclusion, that *Argersinger* is controlling only if contempt proceedings are "criminal prosecutions."

Although courts have traditionally attempted to distinguish between "civil" and "criminal" contempt, it cannot be pretended that the distinction, if it in fact serves any useful purpose, is clear and free of problems. *See Bessette v. W.B. Conkey Co.,* 194 U.S. 324, 328–29, 24 S.Ct. 665, 666–67, 48 L.Ed. 997 (1904).

In *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 420, 31 S.Ct. 492, 55 L.Ed. 797 (1911), the court's effort to distinguish between civil and criminal contempt produced the following interesting statement:

It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two

classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.... Imprisonment [for civil contempt] is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he has refused to do.

We find in this statement an assertion that if the "punishment" is "remedial" and for the benefit of the complainant, the "punishment" is for civil contempt. But, if the punishment is for criminal contempt it is "punitive" and is imposed "to vindicate the authority of the court." The concept of "punishment" which is not "punitive" but only "remedial" is as fascinating as it is esoteric. It is also difficult to understand how imprisonment is not inflicted as a punishment but is only remedial because it is intended to coerce the defendant to do what he has refused to do. The "coercive" or "remedial" portion of the order is nothing more than prescribed punishment for future failure to comply with the court order.

In any event, the traditional distinction which makes the purpose of the imprisonment determinative of the nature of the contempt is of little or no utility. The contempt is complete when the willful disobedience is complete. We thus have a situation where a contempt has been committed but no one can say whether it is a civil or criminal contempt or whether the proceeding to determine the manner of dealing with the contempt is a civil or criminal proceeding until the disposition of the case is known. Normally, the available dispositions are determined by deciding whether the act or omission is a civil wrong or a criminal act and the categorization of the proceeding as criminal or civil is determined by the permissible methods available to the court for disposing of the case. But in the case of contempt, whether the contempt is civil or criminal and, consequently, whether the contempt proceedings are civil or criminal proceedings, cannot be determined until the court disposes of the case. Worse still, if the finding of contempt results in the imprisonment of the contemnor—a disposition normally permissible only as the result of criminal proceedings—we remain in ignorance concerning the nature of the contempt and of the proceedings until we determine why the judge is ordering that the contemnor be jailed.

It is not surprising that, because of the difficulty of characterization and the fact that characterization must await the result of the trial and does not determine the possible results, the courts have sought refuge in solemn declarations that contempt proceedings are "quasi-criminal" in nature. Apparently, no court has considered it worthwhile to mention that if such proceedings are only "quasi-criminal" they are, necessarily, also "quasi-noncriminal" or, "quasi-civil."

The Texas Supreme Court has said that contempt proceedings, being quasi-criminal in nature, should conform as nearly as possible to standards applicable to proceedings in criminal cases, and that in determining whether criminal due process requirements are applicable, the classification of such proceedings as *sui generis* or quasi-criminal, is irrelevant. *Ex parte Johnson*, 654 S.W.2d 415, 420 (Tex.1983). The actual holding in *Johnson* was that the right to be present at trial and confront witnesses is so fundamental and essential to fair trial that a person who has been found guilty of contempt during his absence has not been afforded due process, even if such absence was voluntary. *Id.* at 421–22.

It is true that the United States Supreme Court, influenced, perhaps, by the traditional common law theory that contempt proceedings are *sui generis*, has on more than one occasion declared that contempt proceedings are not criminal prosecutions in the Sixth Amendment sense. *Levine v. United States*, 362 U.S. 610, 616, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1960); *Green v. United States*, 356 U.S. 165, 186, 78 S.Ct. 632, 644, 2 L.Ed.2d 672 (1958). However, in *Bloom v. Illinois*, 391 U.S. 194, 195–99, 88 S.Ct. 1477, 1478–81, 20 L.Ed.2d 522 (1968), the court, after reviewing the earlier cases, held that criminal contempt is a

crime to which the jury provisions of the Sixth Amendment and article III, § 2, par. 3 of the United States Constitution are applicable. Applying the rule adopted for criminal cases in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the court in *Bloom* concluded that although petty contempts, like other petty crimes, can be tried without a jury, serious criminal contempts must be tried by a jury if defendant so insists. 391 U.S. at 210, 88 S.Ct. at 1486. *Bloom* must be interpreted as overruling, at least by implication, the earlier decisions that criminal contempt proceedings are not criminal prosecutions in the Sixth Amendment sense. There is no other explanation for the fact that the Sixth Amendment was made a basis for the holding.

█ In this case, the order that relator be imprisoned for 30 days contains no purge provision. It gives relator no right to be released from jail, prior to the expiration of 30 days, by paying the child support he owes. It is impossible to construe this portion of the order as imposing imprisonment for "remedial" or "coercive" purposes. The imprisonment is clearly and solely for punitive purposes.

Our conclusion that the case before us must be classified as a criminal proceeding is strengthened by the following circumstances:

█ 1. A statute allows the court to sentence for contempt one who willfully disobeys a support order. The maximum penalty for contempt is six months. TEX. GOVT.CODE ANN. § 21.002 (Vernon 1985). Such a sentence, if imposed without a purge condition can only be punitive particularly where, as here, there is no showing of a present ability to pay. In the absence of a showing of the defendant's present ability to pay, it cannot be seriously argued that the purpose of the imprisonment is to coerce compliance with the support order. *See Maggio v. Zeitz*, 333 U.S. 56, 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948); *Ex parte Sanders*, 608 S.W.2d 343 (Tex.Civ.App.—Houston [14th Dist. 1980], no writ).

█ 2. In an action to enforce compliance with a support order the court may appoint an attorney to represent the claimant. TEX.R.CIV.P. 308-A; TEX.FAM.CODE ANN. § 21.32 (Vernon 1975). Today, in Texas, the case is often filed by a state agency. Such circumstances support the conclusion that the proceeding is, in fact, criminal. The state marshals its forces to bring charges and produce evidence and seeks imprisonment of the defendant. There is an ostensible public wrong to be vindicated, for nonpayment of support not only involves the violation of a court order and imposes the burden of support on society, it is a violation of a penal statute. TEX.PENAL CODE ANN. § 25.05 (Vernon 1974). The State has thrown its weight behind the complaining party. Minimum considerations of fairness require that the defendant have the benefit of counsel.

█ The interest at stake—defendant's freedom from confinement by the State—is of preeminent importance. The risk of error and the value of assistance of counsel are great. At the very least, proof of inability to comply with the court order is a complete defense, even in cases of civil contempt. *See Maggio v. Zeitz*, 333 U.S. 56, 72, 68 S.Ct. 401, 409, 92 L.Ed. 476 (1948). Clearly, proof of an indigent's inability to comply may present problems requiring expert help.

The case before us illustrates the severe disadvantages faced by an indigent defendant who attempts to represent himself. The evidence is undisputed that, shortly after the parties were divorced, the defendant's ex-wife importuned him to return to the marital home because the children "needed" him. He did so, and the parties resumed cohabitation resulting in the birth of another child. These facts, at the very least, suggest the possibility of a common-law marriage a few weeks after the divorce. The trial court was apparently oblivious to the implications of such testimony, even after some prompting by an attorney present in the courtroom. Relator, unlearned in the law, made no effort to pursue the question. Surely, an attorney

representing relator would have pursued the trail blazed by the undisputed testimony and ignored by the judge and, more understandably, by the unassisted relator.

■ We conclude that in cases where an indigent charged with contempt is not represented by counsel and has not intelligently waived the right to assistance of counsel, a court may not, without violating the constitutional right to assistance of counsel, impose imprisonment as a punishment for disobedience of a child support order.

That portion of the order which orders imprisonment for 30 days, without purge provisions cannot stand.

We must consider the validity of that portion of the order which orders that relator be imprisoned until he pays $6,276.00 in support arrearages plus $306.50 court costs. One pretending to understand the traditional distinction between criminal and civil contempt would immediately characterize this provision as coercive or remedial and conclude that we are now dealing with civil contempt, perhaps parroting the old saw that relator "carries the keys to his prison in his pocket,"[1] since he can secure his release at any time by simply paying $6,582.50.

The condition which defendant must meet in order to use "the keys ... in his pocket" is, in this case, one which he is unable to meet. The only evidence in this case, although presented rather haphazardly by relator, is that he cannot pay and that, in reality, there are no keys in his pocket. The evidence may have been stronger but for the fact that counsel for complainant, apparently irritated by relator's clumsy attempts to show his inability to pay, after politely expressing his willingness to listen to relator's "story," objected that such story had nothing "to do with this contempt hearing" and was "not material." The court merely said "okay" and asked relator if he had "anything else" that

he "needed to tell" the court. Counsel for the complainant answered "No ma'am." The court pointed out that the question was addressed to relator, at which point relator, too, said, "No ma'am."

Clearly, because he was unassisted by counsel, relator failed to press for his right to present evidence concerning his inability to comply. Because of his lack of legal knowledge, he apparently interpreted the court's "okay" as expressing the court's agreement with counsel's objection that his "story" concerning his financial situation had "nothing to do with" the contempt hearing.

The United States Supreme Court has recognized that to "jail one for a contempt for omitting an act which he is powerless to perform would reverse this principle [that imprisonment resulting from civil contempt proceedings is purely remedial or coercive] and make the proceeding purely punitive, to describe it charitably." *Maggio v. Zeitz*, 333 U.S. 56, 72, 68 S.Ct. 401, 409, 92 L.Ed. 476 (1948). *See also Shillitani v. United States*, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966), holding that a contemnor imprisoned for refusal to testify before a grand jury was entitled to be discharged when the grand jury had been finally discharged, "since he then has no further opportunity to purge himself of contempt."

Relator's contention that he was wrongfully denied a jury trial is without merit. In *Duncan v. Louisiana*, 391 U.S. 145, 150, 88 S.Ct. 1444, 1448, 20 L.Ed.2d 491 (1968), the Court held that the Fourteenth Amendment guarantees to defendants in state criminal cases the right to jury trial provided by the Sixth Amendment. In *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), the Court held that serious criminal contempts had to be tried with a jury if the defendant so insisted.

1. The "keys in his pocket" cliché is extremely objectionable because it misleadingly conveys the idea that defendant's confinement for civil contempt is somehow voluntary or self-inflicted and not really confinement at all. It draws attention away from the fact that the sovereign has locked up the defendant who, to gain release, must comply with conditions imposed by the sovereign. In every important sense, the keys remain in the sovereign's hands. *See generally*, D. CHAMBERS, MAKING FATHERS PAY § 7 (1979).

The Supreme Court subsequently established that crimes punishable by imprisonment for more than six months are serious offenses, requiring a jury trial at defendant's insistence, while offenses carrying a maximum sentence of six months or less are petty offenses and may be tried without a jury. The guidelines were summarized by the Supreme Court in *Muniz v. Hoffman,* 422 U.S. 454, 476, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1975) as follows:

> [L]acking legislative authorization of more serious punishment, a sentence of as much as six months in prison, plus normal periods of probation, may be imposed without a jury trial ... but imprisonment for longer than six months is constitutionally impermissible unless the contemnor has been given the opportunity for a jury trial.

■ Since the United States Supreme Court has clung to the distinction between civil and criminal contempt based on the purpose for the imprisonment of the contemnor, it must be concluded that, as far as the right to jury trial is concerned, the test for distinguishing between petty and serious contempt, must be held to apply only to "criminal" contempts, that is, to that portion of the court's order which orders imprisonment for the purpose of punishing the contemnor. This means that we may not consider the "remedial" or "coercive" portion of the order which condemns the contemnor to jail until he complies. Since the punitive portion of the order in this case decrees imprisonment for less than six months, relator's argument based on the federal constitutional right to a jury trial must be rejected. *See Codispoti v. Pennsylvania,* 418 U.S. 506, 511–12, 94 S.Ct. 2687, 2690–91, 41 L.Ed.2d 912 (1974).

■ Our conclusion concerning the right to a jury in no way rests on relator's failure to insist on a jury trial, since in the case of a serious offense,[2] the waiver of a right to a jury trial will not be presumed from a silent record. *Samudio v. State,* 648 S.W.2d 312 (Tex.Crim.App.), *cert. de-*

*nied,* 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1368 (1983).

■ We agree with relator that the finding of contempt cannot stand because there is no evidence to support a finding that relator was able to make the support payments and that his disobedience of the support order was willful.

The Texas courts have held that contempt proceedings should conform as nearly as practicable to those in criminal cases. *Deramus v. Thornton,* 160 Tex. 494, 333 S.W.2d 824, 829 (1960). Our courts have held that the right against self-incrimination is applicable, because a trial for criminal contempt is an inherently criminal proceeding. *Ex parte Werblud,* 536 S.W.2d 542, 548 (Tex.1976). In *Ex parte Johnson,* 654 S.W.2d 415, 421 (Tex.1983), the right to be present at trial and confront witnesses was recognized as a right of a person charged with criminal contempt, because such a right is fundamental and essential to a fair trial. The Texas courts certainly agree with the statement in *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968) that criminal contempt "is a crime in every fundamental respect."

The right to proof beyond a reasonable doubt must, in our system, be recognized as a procedural safeguard which is fundamental and essential to a fair trial under traditional notions of due process. *Santana v. Texas,* 397 U.S. 596, 90 S.Ct. 1350, 25 L.Ed.2d 594 (1970). The court adhered to the concept, previously stated in *In re Winship,* 397 U.S. 358, 365, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) and *In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967) that the possibility of punitive imprisonment requires the application of criminal due process protections, regardless of the label applied to the proceedings.

The right to proof beyond a reasonable doubt clearly stems from another fundamental right—the right to be presumed innocent. In fact, the usual statement is

**2.** Even in the absence of punitive incarceration for more than six months, the contempt may be classified as serious because of the amount of

the fine imposed. *See Muniz v. Hoffman,* 422 U.S. 454, 477, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1978).

that the accused is presumed to be innocent until his guilt is established beyond a reasonable doubt, clearly indicating that the "presumption" of innocence is but another way of stating the requirement of proof beyond a reasonable doubt.

This cherished presumption is reduced to little more than a meaningless incantation if proof beyond a reasonable doubt is allowed to be established by unreasonable presumptions. In Texas, the rule has been said to be that once there has been proof of delinquency in payments, the defendant has the burden of proving that his failure to pay was not contumacious. He must present evidence not only that he has no funds but also (1) that he lacks sufficient property which can be sold or mortgaged to raise the needed money; and (2) that he has unsuccessfully attempted to borrow the needed funds from financial institutions; and (3) that he knows of no other source from whom the money could be borrowed or otherwise obtained. *Ex parte Lindsey*, 561 S.W.2d 572, 574 (Tex.Civ.App. —Dallas 1978, no writit).

The imposition of such a burden of proof is blatantly inconsistent with the presumption of innocence and the requirement that defendant's guilt must be established beyond a reasonable doubt. Such a rule is clearly based on a presumption that failure to make the required payments is proof beyond a reasonable doubt of ability to pay. There is no reasonable basis for such a presumption. Proof of failure to pay amounts to no more than proof of failure to pay. There is no justification for the unwarranted inference that failure to pay establishes ability to pay. There are, of course, some "presumptions" applied in criminal cases, such as the rule that use of a deadly weapon permits the inference that the user intended to kill or inflict serious bodily injury. But such rules do not relieve the state of its burden to prove defendant's guilt beyond a reasonable doubt and shifting the burden to disprove some element of the offense is a denial of due process. *Lowry v. State*, 692 S.W.2d 86, 87 (Tex.Crim.App.1985) (en banc).

In this case, there is no "evidence" of relator's ability to comply with the support order other than the fact that he did not comply. At the very least, where defendant produces some evidence of inability to pay, he should not be imprisoned unless there is evidence sufficient to support, beyond a reasonable doubt, the finding of ability to comply.

Relator is ordered discharged.

REEVES, Justice, concurring in part and dissenting in part.

While I concur with most of the majority's opinion in this case delivered on April 30, 1986, I respectfully dissent to that portion of the majority's opinion which places the burden on the movant to prove beyond a reasonable doubt that the respondent has the ability to make the child support payments. The majority seems to base their reasoning, in part, upon *Lowry v. State*, 692 S.W.2d 86 (Tex.Crim.App.1985) (en banc). In *Lowry*, the respondent was charged with intentionally and knowingly failing "to provide support that he can provide ... for his children ...". TEX.PENAL CODE ANN. § 25.05. The Court of Criminal Appeals found unconstitutional that part of the statute which stated that "It is an affirmative defense ... that the actor could not provide the support that he was legally obligated to provide" since the statute shifts the burden of disproving an element of the offense to the defendant, in violation of the due process clause of the Constitution. In a child support enforcement action, respondent's inability to pay is not an element of the offense of non-support; it is a defense to the charge of contempt.

In the present case, the parties' ability to support the children was determined at the original hearing and it is assumed that a reasonable amount of support, within respondent's ability to pay, was set. In the event of a material and substantial change of circumstances which would prohibit respondent from complying with the original order, he should seek the change and it should be incumbent on the respondent to produce evidence supporting a change in

the original order. TEX.FAM.CODE ANN. § 14.08(c)(2).

Our Supreme Court has held that the inability to comply with a child support order is a good defense, but that the burden of proof is on the respondent. *Ex parte Padfield,* 154 Tex. 253, 276 S.W.2d 247, 251 (1955); *Ex parte Kollenborn,* 154 Tex. 223, 276 S.W.2d 251, 253–54 (1955). The *Padfield* and *Kollenborn* cases have been routinely followed in this state for thirty years. The latest court of appeals case to place the burden of proof on the respondent is *Ex parte Burroughs,* 687 S.W.2d 444 (Tex.App.—Houston [14th Dist.] 1985, no writ). The majority has shown no compelling reason to overrule these cases.

The majority's opinion, if upheld, will force the movant in a child support enforcement action to produce evidence on the nonmovant's financial status, an onerous burden and not in the best interest of the child.