**Ex parte Ronald Charles SIMPSON.**

No. 09–87–087 CV.

Court of Appeals of Texas, Beaumont.

Sept. 3, 1987.

**940**

Shimon Kaplan, East Texas Legal Services, Beaumont, for relator.

Pierre Landry, Asst. Atty. Gen., Office of Child Support Enforcement, Beaumont, for respondent.

## OPINION

BURGESS, Justice.

This is a habeas corpus arising out of a child support contempt case. In a 1978 decree of legitimation, Relator was ordered to pay child support. In 1982, he was found in contempt for failure to pay the support and placed on probation for five years. On July 11, 1985, a motion was filed seeking to revoke the probation and capias was issued for Relator. In March 1987, Relator was placed in custody as a result of the capias and other unrelated criminal charges. On April 2, 1987, the court set bond and scheduled a hearing for April 6, 1987. At the hearing, the court revoked Relator's probation and ordered him confined for six months and thereafter until the arrearage had been paid. Relator filed this writ of habeas corpus urging, among other things, that his confinement is illegal because at the April 6 hearing, he was not advised that if he was indigent he was entitled to court-appointed counsel.

■ The law is clear that an indigent has the right to court-appointed counsel in a child support contempt proceeding. *Ex parte Lopez*, 710 S.W.2d 948 (Tex.App.— San Antonio 1986, no writ); *Ex parte Hamill*, 718 S.W.2d 78 (Tex.App.—Fort Worth

1986, no writ); *Ex parte Sustrik*, 721 S.W.2d 592 (Tex.App.—Fort Worth 1986, no writ); *Ex parte Young*, 724 S.W.2d 423 (Tex.App.—Beaumont 1987, no writ). Each of these cases holds that when the issue is raised the court is obligated to advise the alleged contemner of the right to a court-appointed attorney. A recent case, *Ex parte Strickland*, 724 S.W.2d 132 (Tex. App.—Eastland 1987, no writ), treats the subject in a slightly different manner. The Eastland court recognizes the established rule but views it as a question of waiver, holding that an individual cannot intelligently and intentionally waive the right to counsel unless he has been advised of that right. The court goes on to hold that without a valid waiver of counsel a judgment of contempt is void.

■ It does not seem too onerous a burden to require that all alleged contemners be advised of the right to court-appointed counsel if indigent without requiring that the question be raised. We, however, do not need to reach that result in the instant case. At the time of the hearing, the question of indigency was raised by Relator. On April 3, 1987, Relator sent the court a letter. While the letter is not explicit on the issue, there are numerous allusions to indigency. While Relator did not offer any testimony at the hearing, he certainly asked "questions" which were in the nature of testimony. Included in these "questions" were declarations which raise the question of his indigency. The question having been raised, the trial court should have informed Relator of his right to court-appointed counsel. Because the court failed to do so, the subsequent orders of revocation of probation and contempt were void. The writ of habeas corpus is granted and Relator discharged.

BROOKSHIRE, Justice, dissenting.

At the threshold, it should be pointed out that, on or about April 22, 1987, we did permit, by a formal leave of court, a motion to file a writ of habeas corpus. Thereafter, we released the Relator, but only upon the condition of making a $1,500.00 bond. It

was the writer's understanding that that would put the Relator at his liberty or "on the street", so to speak. This action would allow the habeas corpus proceeding to be set down for oral argument in the due course of the docket of this Court. It seems obvious to me from the entire record that there are some important, material, vital, and ultimate fact issues to be resolved, as well as serious questions of law to be determined.

However, this has not been done. There has been no setting of the case for oral submission. If I am in error in my understanding, I apologize to my excellent colleagues. Under this record, it seems to me that oral submission and full argument by both sides would be beneficial to the court. There has been an adequate response filed. With respect, I think the opinion and Majority's holding that the writ of habeas corpus is *granted* (though never heard) and the Relator discharged is clearly wrong. The Court necessarily finds that the revocation of probation and the order of contempt were totally void. This habeas corpus attack is collateral. This is not an appeal.

There is a complete statement of facts that has been brought forward on the motion to revoke probation. It is not necessary to repeat at length the questions and answers in the statement of facts. However, there was no suggestion made to the trial court at the beginning of the proceeding that Ronald Charles Simpson was indigent or that he wished or required a lawyer. In fact, his conducting of the cross-examination of the complaining witness, the mother of the child involved—the mother being Lanetta Ann Wingate—indicates that he did not need an attorney at the hearing.

It was shown by the testimony of Lanetta Ann Wingate that Ronald was considerably behind in his child support, and it is abundantly clear that Mrs. Wingate, the mother and managing conservator of the child, did not at any time, according to this record, tell the Relator that she did not desire for him to support their daughter.

Previously, the Relator had been ordered to pay the amount of $86.00 a month for child support. He was definitely in violation of that order. In fact, there is strong evidence showing that Ronald was specifically advised that, since Mrs. Wingate was on what is known as A.F.D.C. or welfare, it was no longer left up to the mother as to whether or not the Relator should or would pay child support. In fact, he was required to pay child support. The attorney who questioned Mrs. Wingate on direct examination was actually an Assistant Attorney General of Texas. Mr. Simpson, the Relator, cross-examined the mother of their daughter at considerable length. I think a very fair summary of this cross-examination was that from time to time Relator had given the daughter a gift on her birthday and at Christmas time and Easter. But, as far as making money payments for support, I find that the cross-examination did not disprove that he was in arrears. Certainly the main thrust of Mrs. Wingate's testimony, which was unshaken by cross-examination, was that the basic needs of the daughter were not being taken care of. Certainly the child's basic needs were not being taken care of by the Relator.

The mother and managing conservator dogmatically stated that the Relator had not been supporting the child, whose name was Renasha. In fact, there was one instance where the daughter was taken to the emergency room of a hospital, apparently for the treatment of an asthma attack or some similar serious malady. The father was immediately notified. He was asked for some support. No response from him was made until three days later.

It is true that the girl spent some time with the Relator and, during that time, he fed her and dressed her. The Relator admitted: "I know that I owe the state money. I know that." Apparently this is in reference to the fact that the Attorney General's office was in the proceeding in an effort to enforce the child support orders. The daughter is an asthmatic and she has been ill with attacks from that disorder.

She has needed special medication for the asthma attacks. The mother claims that the father had not bought any medication for the asthmatic condition.

As I read the record, at no time did Relator take the position that he was indigent, or that he could not hire an attorney, or that he even desired an attorney. He certainly never asked the court for an attorney. Relator, I think, waived any right he may have had for a court-appointed and taxpayer-paid lawyer. The record does reflect that three days after one of Renasha's illnesses, the Relator did come to visit her. At that time, the child told him that the mother or the maternal grandmother had procured the medicine prescribed for her condition.

During the concluding part of the cross-examination of the mother by the Relator, the questions were asked:

"Q. Okay. The whole thing that—The whole thing boils down to a nutshell, and you can only say—you can only say the truth of what? Just tell the Court have I been taking care of Renasha as a father, not as someone that's on the street and not have been—Excuse me. Not have been doing not one thing for the girl? Just tell the Court just that, and I am definately [sic] through.

"A. I have stated to the Court previously that you have contributed through gifts. As far as support for her, no.

"Q. You are saying money, aren't you, Miss Wingate?

"A. Yes.

"Q. Okay. All right. When you say money, you are saying for food? Are you saying for food, Mrs. Wingate?

"A. Ronald, first—

"Q. Just answer my question. For food, MRs. [sic] Wingate?

"A. Yeah. Ronald—

"THE COURT: Just listen to the question and answer his question, Mrs. Wingate.

"THE WITNESS: For whatever is needed."

After the cross-examination was concluded and after the State's attorney offered into evidence the decree of legitimation, as well as the previous order of contempt of court for nonpayment of child support, and after the introduction of a detailed Jefferson County Child Welfare Support ledger showing that the Relator owed $6,274.30 through March 25, 1985,—then the court specifically asked:

"THE COURT [ADDRESSING MR. SIMPSON]: Do you have any evidence you want to bring before the Court?

"MR. SIMPSON: No, I sure don't. I think I explained everything to him, sir.

"THE COURT: All right. Both sides rest."

As I understand the record, which is a complete one, there was absolutely no indication made *in the hearing* that the Relator was indigent or was entitled to an attorney *or even desired one*. He certainly conducted the cross-examination of Mrs. Wingate, the mother and managing conservator of the child, in a vigorous and piercing manner.

There exists a handwritten letter from the Relator to an unnamed judge. I deem this letter is not properly before us. Relator admits that he does not know the name of the judge, and apparently the letter was written several days prior to the hearing. It was received on April 3rd, but it was not called to the attention of the district judge who conducted the hearing. This letter was not introduced in evidence. Its ex parte, self-serving statements were not subject to cross-examination or rebuttal. Nevertheless, I think the letter does not show indigency. In fact, the letter itself points out that Relator had been working for Washington Manor Apartments as a maintenance man. In the letter, Relator stated that he had been married about two years before the date of the letter and that he had a baby of his own by his present ceremonial wife. The baby was named Brittany. He apparently was supporting his new family. He had done plumbing work, painting work and wiring work. He

also professed in the letter that he had done "lots of work for U.S. Judge Joe Fisher for 6 years." A reasonable interpretation of the letter was that he had done considerable work of various types for extended durations for several employers. The letter, standing alone, certainly does not make out a case of indigency for Relator. It certainly does *not prove that he could not have paid any of the child support installments as they accrued.* He wrote that his wife Vicki was working at a cleaning company and the major part of her duties was cleaning commercial or business offices.

Also in the record is the fact that he had some knowledge of legal procedures. He had been charged in the County Court at Law with a complaint of unlawfully appropriating property by acquiring and exercising control over corporeal personal property, being one Kenmore refrigerator having a value of at least $200 but less than $700, with the intent to deprive the complainant of that property, and without the effective consent of the complainant. At that hearing in the County Court at Law, the record shows that he affirmatively waived his right to counsel.

A fair reading of the proceedings before the trial judge would simply not put that jurist in a position of even suspecting, much less knowing, that the Relator was indigent, if he was. There was no evidence offered on indigency at the hearing and there was certainly no request by the Relator for the appointment of an attorney.

With respect, I submit that the practical results of the court's holdings, under this record, are that the trial judge must, sua sponte, conduct an indigency hearing in every case, that an attorney must be appointed for the non-supporting parent, that the attorney appointed then must and should investigate the facts, that a continuance likely will be granted, and that additional taxpayers' funds will be exacted to pay a reasonable fee. In fact, the Majority requires that "all alleged contemners be advised of the right to court-appointed counsel if indigent *without requiring that the question be raised.*" (emphasis added)

This places a heavy burden on the trial court, forcing that busy judge to ask questions that would probably require some self-incriminating responses or admissions against interest, and statements from the Relator that would damage his defenses. This places the trial judge in an intolerable position. Moreover, a new field for court-appointed lawyers is established with more taxes extracted to pay for same.

Under this record, the district judge would have had to cross-examine and delve deeply into the present and past financial position of the Relator and, in doing so, would probably have had to ask him questions like: "Are you working now? What is your salary? When did you last work? How long was the duration of your last employment? What money did you make?" These sorts of questions would have a tendency to self-incriminate the Relator if he answered them and at least some of the responses would probably be admissions against interest. Therefore, it seems unreasonable to require the District Judge, at least under this record, to go into such a searching, piercing and revealing examination. Another consideration is that if, under records like this one, attorneys have to be appointed, then the District Judge would have to order the same paid out of the general funds of the county treasury, which is raised in large part by ad valorem taxes on homesteads. This would be an unjustified expansion and increase of taxes on homesteads and other ad valorem taxes, as well as other tax extractions. Hence, the situation would be that the taxpayers would be paying to *enforce* reasonable child support orders and also paying legal costs, in effect, to *defeat the enforcement* of reasonable child support orders. What irony for the taxpayers of Texas!