**Ex parte Charles Monroe BERRYHILL.**

**No. 09–87–194 CV.**

Court of Appeals of Texas,
Beaumont.

May 5, 1988.

Harold J. Laine, Jr., Beaumont, for appellant.

C. Haden Cribbs, Jr., Cribbs, Lewis & Bradford, Keith Griffin, Beaumont, for appellee.

## OPINION

BURGESS, Justice.

This is a child support contempt case. On March 25, 1985, a decree of contempt was entered against relator for failing to pay child support as ordered. The decree assessed punishment at six months confinement in the county jail, but suspended the commitment and placed relator on probation for five years. A motion to revoke probation was filed January 15, 1987, and a hearing held on June 29, 1987. An order was entered revoking appellant's probation and ordering him to jail for six months. On September 3, 1987, relator filed his petition for habeas corpus and attached an affidavit alleging that at the time of the March 25, 1985, hearing, he had raised the issue of his indigency, and had requested the court to appoint him counsel, but that no hearing was held on the issue of indigency and no counsel was appointed.

This court admitted appellant to bond and on November 5, 1987, issued an opinion, *Ex parte Berryhill*, 741 S.W.2d 186 (Tex.App.—Beaumont 1987, no writ), which ordered the court below to conduct an evidentiary hearing. The results of that hearing are now before us. We find the following testimony from relator:

Q. Now, did you have any conversations with the judge concerning whether or not you desired an attorney or whether you had an attorney?

A. Yes. The judge asked me did I have an attorney. I said, "No. I couldn't afford one. I'd like the Court to appoint me an attorney."

Q. Okay. And was one appointed for you?

A. No, sir.

Q. Did—Were you able to at that time afford an attorney [sic]?

A. No, sir.

. . . .

Q. So, to sum up, Mr. Berryhill, did you at any time ask Judge Farris to appoint you an attorney?

A. Yes, I did.

Q. Did you say that you could not afford one?

A. Yes, I did.

Q. And did you, in fact, have an attorney to represent you?

A. No, sir.

Q. Would you have desired to have an attorney represent you at that March 25th hearing?

A. Yes.

The judge who presided over the March 25, 1985, hearing testified thusly:

Q. Do you have an independent recollection of this particular hearing in March of '85?

A. I've tried to look at Mr. Berryhill, and I do not have an independent recollection of it. I do not.

Q. Do you recall what the policy of your Court was at that time?

A. Very definitely.

Q. And if it is correct that a respondent in a contempt action were to appear in front of you—were to have appeared in front of you, March of '85, and asked for a counsel because he could not afford one, what would have been your response?

A. I would have stopped and had a hearing on indigency and ascertained whether he could afford an attorney or not.

Q. All right, sir. Judge Farris, have you been present this morning when Mr. Berryhill was testifying?

A. Yes, I was.

Q. You have heard him testify as to the assets that he had available to him and that he did not have available to him in March of '85. Based on that testimony, do you know whether you would have at that particular time appointed counsel?

A. I'm—I would probably have liked to have gone into it a little bit further about the cars. I would have looked into it and I can't say whether I would have appointed an attorney or not based upon that. If he did have some assets and—It's hard to say, Mr. Griffin, what I would have done two-and-a-half years ago.

The attorney for the ex-wife gave the following testimony:

Q. Now, Mr. Cribbs, do you have an independent recollection of this hearing?

A. Yes, I do.

Q. Do you recall, first, visiting with Mr. Berryhill in the child support office and then a hearing in Judge Farris' courtroom?

A. Yes, I do.

Q. At that hearing, do you recall Mr. Berryhill complaining indigency and asking for court appointed counsel?

A. I recall Mr. Berryhill saying that he had no money and he couldn't pay his child support. I, also, recall—I don't recall at all him asking for an appointed attorney. I'm not saying that he didn't. I just do not recall that at all.

This court recognized in *Ex parte Young*, 724 S.W.2d 423, 424 (Tex.App.—Beaumont 1987, no pet.) that the due process clause of the fourteenth amendment of the U.S. Constitution imposes a duty on the state to provide counsel to a person who, because of indigency, cannot afford an attorney, whenever that person "may lose his liberty if he loses the litigation" citing *Lassiter v. Department of Social Services*, 452 U.S. 18, 25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981); *Miranda v. Arizona*, 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966); *see also Ridgway v. Baker*, 720 F.2d 1409, 1413 (5th Cir.1983). We have recently recognized that placing a person on child support probation is sufficient restraint on a person's liberty. *Ex parte Conner*, 746 S.W.2d 527 (Tex.App.—Beaumont, 1988, n.w.h.).

■ The law is sufficiently clear in this state that an indigent is entitled to court-appointed counsel in a child support contempt proceeding. Further, when the issue is raised, the court is obligated to advise the alleged contemner of the right to a court-appointed attorney. *Young, supra; Ex parte Strickland*, 724 S.W.2d 132 (Tex. App.—Eastland 1987, no writ); *Ex parte McIntyre*, 730 S.W.2d 411, 415 (Tex.App.—San Antonio 1987, no writ); *Ex parte Simpson*, 736 S.W.2d 939, 940 (Tex.App.—Beaumont 1987, no writ); *Ex parte Lopez*, 710 S.W.2d 948, 951 (Tex.App.—San Antonio 1986, no writ); *Ex parte Hamill*, 718 S.W.2d 78 (Tex.App.—Fort Worth 1986, no writ); *Ex parte Sustrik*, 721 S.W.2d 592 (Tex.App.—Fort Worth 1986, no writ).

■ In the instant case, relator states unequivocally that he raised the issue of his indigency and no hearing was held nor was he advised of his right to have court-appointed counsel. This is not contradicted by either the trial judge or the ex-wife's counsel. The trial judge candidly admitted he had no independent recollection, nor should he have been expected to have. The attorney verifies relator raised the indigency question but doesn't recall relator asking for an attorney. When the question of indigency was raised, the trial court should have informed relator of his right to court-appointed counsel. Because there is no proof that the court did so, the subsequent orders of revocation of probation are void. *Simpson*, 736 S.W.2d at 940.

The writ of habeas corpus is granted and relator discharged.

WRIT GRANTED.

BROOKSHIRE, Justice, dissenting.

In a prior opinion, involving the same Relator, we remanded the cause for additional hearings to take evidence and to forward to us, inter alia, a Statement of Facts.

On the date of the court's previous opinion, November 5, 1987, we possessed no Statement of Facts, no formal or meaningful Transcript and no Brief from Relator. The November 5, 1987, opinion was published at 741 S.W.2d 186, to which reference is made. We now have, for our consideration, a record.

Berryhill admitted, on November 11, 1987, before Judge Robert Walker:

"Q. Other than the fact that you did not have an attorney, was the issue raised that you could not afford an attorney back then? In 1987 did you raise the issue of—My point is, did you attempt to argue that the March '85 order was invalid because you were not appointed an attorney at the June '87 hearing?

"A. No, sir, it wasn't argued.

"Q. All right. The first time that this has been raised was the affidavit that you filed for the purposes of this writ; is that not correct?

"A. Would you repeat that for me?

"Q. The first time that the issue of the '85 order being invalid because you did not have an attorney present, could not afford an attorney, the first time that issue has been raised was the affidavit that you signed for purposes of this hearing; is that not correct?

"A. No, sir. It's in the June '87—No. The—In front of Judge Walker here. It was raised in that. It's on page 16 and 17 or 17 and 18.

"Q. Well, it says you didn't have a lawyer. *But was there ever any attempt to say that the '85 order was invalid because of that?*

"A. *No, sir.*" (Emphasis added)

Mr. Berryhill testified that his income for 1984 was $13,072; that his income for 1985 was $4,827.50. In response to interrogatories, he answered that he received the gross amount of approximately $250 per week from his primary place of employment, from which no federal income tax was withheld nor was any social security tax withheld. He further answered that his net take home pay was $250 weekly. The interrogatories concerned the calendar year of 1985. Berryhill signed the answers personally and swore:

"... they are true and correct." The Statement of Facts does not substantiate Berryhill's contentions concerning the referenced pages.

Mr. Berryhill had paid $200 per month for January, February and March of 1987, but had not paid any child support for April and May, 1987.

The record reflects that in 1985 Berryhill had a boat, a dune buggy, a Cadillac and a Chevrolet. The value of the boat in March of 1985 was approximately $500 and other assets showed a valuation, including the boat, of about $700. He had an American Express Gold card, valid in March, 1985. Berryhill testified that he had borrowed on the American Express card to pay for the bail bond premium to get out of jail and he had borrowed on it to pay his attorney's fee. He said he paid some back child support. However, the record indicates that these payments took place after the March, 1985, hearing. Indeed, Berryhill agreed that, at the time of the March, 1985, probation hearing, the American Express card was valid and $2,000 was borrowed on it after the March, 1985, hearing. Later, he changed his testimony and said he had borrowed the money on what was known as a Colonial National Bank Credit card. He had a current American Express card, which was valid from April, 1986, through April, 1988. This American Express card was a Gold card and there was evidence that the American Express issues a Gold card, initially, for a twelve-month period. Thus, the logical conclusion is that, for the twelve months prior, Berryhill possessed a Gold card.

Judge James Farris testified that it was the definite policy of his court that, if a Respondent in a contempt action appeared before him or his court in March of 1985 and asked for counsel because he could not afford one, *Judge Farris would have stopped and had a hearing on indigency and ascertained whether the Respondent could afford an attorney. This testimony is uncontroverted.*

A reasonable attorney's fee for the hearing in March of 1985, according to Judge Farris, would have been *something less than $700.* The Judge testified that he did not have an independent recollection of the particular hearing involving the Respondent, Berryhill, in March of 1985. There was no cross-examination of any of the Judge's testimony on this point. There was no cross-examination as to the reasonableness of the less than $700 attorney's fee for the contempt action.

Honorable C. Hayden Cribbs was the next witness. He was the attorney for Mrs. Rhonda Berryhill at the hearing in March, 1985. He did have a clear, firm recollection of the hearing. In substance, he did recall Mr. Berryhill saying that, as of the time of the hearing, he could not pay all of his child support but Mr. Cribbs did not recall Mr. Berryhill asking for an appointed attorney.

Mr. Cribbs also recalled as follows, concerning any of Mr. Berryhill's assets that could have been disposed of:

"Q. Do you recall the nature of that testimony?

"A. The original testimony was that he had no assets. And I think, if I remember, Rhonda, or his ex-wife, pointed out to me that he had a Cadillac automobile, and a boat and some other automobiles. He, also, lived in a home and he had his son living there and another person; that he supposedly had been supporting another lady; that he was making money but it was in his son's name because of the heart problem he had."

Mr. Cribbs was one of the five attorneys who was appointed by the Family Law Courts to handle prosecution of child support matters. He also acted frequently in other cases as defense counsel in child support matters. He stated that he was familiar with the fees charged by attorneys for representation as defense counsel in defense of contempt matters and he testified that the reasonable amount for such a fee would be from $350 to $500.

Cribbs testified that to get a Gold American Express card, it was necessary to have a bank officer's signature or a credit line of up to $2,500 approved by a bank. Cribbs was the holder of both a Green card and a Gold card from the American Express.

Rhonda Ann Berryhill's contentions were that she had shown to the court, from the papers in the court's file, that at the time Mr. Berryhill was placed on probation he was $3,000 and some odd dollars in arrears and, further, that, at the time of the June 29, 1987, hearing, he was then over $6,000 in arrearage on his child support.

It is correct that Mr. Berryhill had undergone a by-pass operation in or near the month of September, 1984, but there was also evidence that he had recovered and he was actively engaged in the painting and painting contracting business. He had made a good recovery. Mr. Berryhill confirmed, at the June, 1987, hearing that he was a self-employed paint contractor and that his income was approximately $1,000 per month from contract work. Up to the time of the hearing for that calendar year, Mr. Berryhill testified that he had made $2,475.

It is noteworthy and, indeed, remarkable that Mr. Berryhill admitted, unequivocally, that he did have the ability to pay the child support as it was ordered to be paid back on March 25, 1985, at the rate of $140 per week, but claimed he did not have the ability to pay the additional $50 per week to catch up on the arrearage. Certainly, the trial judge properly concluded that Berryhill could pay at least $140 per week. Berryhill had failed to pay the $140 per week. Hence, on this basis, the contempt order was not void or even voidable.

Berryhill was also making payments on the purchase of his home at the rate of $204 per month. Furthermore, Berryhill admitted receiving, in 1987, as salary, the sum of $600 in February; $825 in March; $550 in April and $500 in June. At the June, 1987, hearing the trial judge found that Mr. Berryhill had violated the conditions of his probation and his probation was revoked. The action and orders of the trial judge were *not void.* At the June, 1987, hearing, Berryhill had a lawyer of his own selection and a record was made.

A habeas corpus proceeding involves a *collateral attack upon a trial court's contempt order.* Therefore, the granting of a writ of habeas corpus is not justified unless the order was absolutely void. It is not enough that the order be erroneous or defective. *Ex parte Browne,* 543 S.W.2d 82 (Tex.1976); *Ex parte Rhodes,* 163 Tex. 31, 352 S.W.2d 249 (1962); *Ex parte La Rocca,* 154 Tex. 618, 282 S.W.2d 700 (1955).

In *Ex parte Helms,* 152 Tex. 480, 259 S.W.2d 184, 186 (1953), the Supreme Court set out the test to determine a void order. The high court wrote:

"[I]t is well established that a proceeding of this nature is a collateral attack on the contempt judgment and this court may order the contemner released only where *the judgment is void because of lack of jurisdiction in the court to render it, or because the contemner was deprived of his liberty without due process of law* which in itself involves a want of jurisdiction." (Emphasis added)

A simple test of a contempt order, as to whether the same is void, is that the order must be beyond the power of the court to enter. *Ex parte Gorena,* 595 S.W.2d 841 (Tex.1979).

The power to punish for contempt is an inherent power of the court and an essential element of judicial independence and authority. *Ex parte Browne,* 543 S.W.2d 82 (Tex.1976). This power enables courts to convince parties to obey and abide by an order or decree of the court in order that the court's order shall not be rendered ineffectual by recalcitrant litigants. *See Ex parte Werblud,* 536 S.W.2d 542 (Tex.1976).

The judge entering the contempt order stood by his earlier decision and the record shows that there is ample evidence to support the conclusion that had Berryhill, at the prior hearing, asked for an attorney to be appointed, Honorable James Farris, District Judge, would have done so without hesitation.

Under this record, it is clear that the challenged orders are not void. The court below had jurisdiction. Berryhill, the contemnor, was not deprived of his liberty without due process of law. He was represented by able counsel before a district judge, who made a record.

This court should consider the daily necessities of the minor child or children, along with the contentions of the Relator. The child or children are entitled to support for their daily necessities of life, such as food, a place to lay their heads at night and some reasonable amount of clothing, as well as support for other bare necessities of existence.

This collateral attack, by way of habeas corpus, challenges the June, 1987, hearing. The decree of contempt and the order of commitment were signed and rendered at the June, 1987, hearing at which Relator was competently represented. The court's opinion, on conflicting evidence and testimony, grants the writ of habeas corpus. Conflicting evidence does not make the trial court's orders void or even voidable under this record. Furthermore, the court reaches back to the March, 1985, hearing to justify granting the writ, even though the writ for habeas corpus complains of the orders of the trial court arising from the June, 1987, hearing.

The majority opinion evidently is based on one phase of the record, primarily, if not solely, on one version of the testimony of Berryhill. It is obvious that the trial judge was not compelled to believe this one phase or part of Berryhill's testimony. The trial court had a right to disbelieve the Relator; this the District Judge obviously did. The writ should not issue.

The remarkable fact is that the ex parte affidavit of Relator's, that was the basis for this habeas corpus proceeding, was signed on September 3, 1987, being about 66 days after the June hearing. This same ex parte affidavit was signed about 29 months and 9 days after the March 25, 1985, hearing.

The result, in practical terms, of the Ninth Court of Appeals' decision today is this: After two full hearings, when no actual request for an attorney had been made; and, then, later, after the passage of a considerable amount of time, an ex parte, out-of-court affidavit was made by the con-

temnor; nevertheless, regardless of the record made in the trial court, and even though, at the second June, 1987, hearing, the contemnor had the full services of an attorney of record, being an attorney of his own selection, and a full record having been made; our court holds that the Relator-contemnor is entitled to a writ of habeas corpus. Hence, there will be another delay in obtaining reasonable child support for the child or children involved.

The horrendous gravity, as well as the stark danger, of the court's decision is this: Neither the acts, actions, orders or judgments of the trial court, done at the June, 1987, hearing are attacked. The June, 1987, orders and judgments are those that assessed jail time to Berryhill and no irregularities or infirmities plague the June, 1987, orders and judgments.

The Court goes all the way back to the March, 1985, hearing to eviscerate the careful, conscientious trial court's orders and judgments of June, 1987.

Query: Since the case law requiring the appointment of an attorney at the merest suggestion of indigency is of late vintage and, since the statutory law requiring a full record of the hearing be made and transcribed, has become effective fairly recently, then, as to those reasonable, proper and correct child support orders that were signed and entered before these changes in the law, which ones, if any, are now enforceable? Query: Has not the court's decision opened a "Pandora's box" as to the great majority of existing child support orders?

The Court cites *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), as a landmark case. It is interesting to note that *Lassiter, supra,* was a case involving termination—finally severing—of the parental rights and status of the mother of a neglected child. There, the Supreme Court of the United States, in briefest capsule form, held that refusal to appoint counsel for an indigent parent—being the mother in this case—in a parental status termination hearing, was not violative of the due process clause of the *U.S. CONST. Four-*

*teenth Amendment.* Moreover, as I read the proper generalization that emerges from the United States Supreme Court's precedents on an indigent's right to an appointed counsel, that generalization is that such right has been recognized to exist only where the indigent litigant may be deprived of his actual, physical liberty. Abby Gail Lassiter, the mother, had later been convicted of second degree murder and had received a sentence of 25 to 40 years imprisonment. She had entered the prison and her indigency was clearly shown.

The Court also cites *Ridgway v. Baker*, 720 F.2d 1409 (5th Cir.1983). In *Ridgway, supra,* the Fifth Circuit wrote that the *father had definitely made an assertion of indigency.* The father had also *made a definite request for counsel.* The record in our instant case is certainly different; it is, at best, cloudy and indistinct. *Lassiter, supra,* was decided on June 1, 1981. *Ridgway, supra,* was decided on December 12, 1983. *TEX.FAM.CODE ANN. sec. 14.32* (Vernon 1986), requiring a record of the proceedings to be made by a court reporter, was not effective until September 1, 1985. These decisional authorities and statutory law are of recent origin. Hence, the Court jeopardizes, by its reasoning and holding today, the great multitude of child support orders signed before the above authorities were in effect. Prior to these authorities and precedents, I think the district judges of Texas could not have anticipated the new rules and requirements.

From this record, it is obvious to me that neither one of the two experienced, conscientious district judges placed any credibility or truthfulness in the September, 1987, affidavit. Indeed, I opine, it would have been strange if either Judge Farris or Judge Walker had believed that affidavit. Certainly, by necessary implication and by their respective rulings, each district judge disbelieved that Berryhill had brought forth his alleged indigency or had asked for the appointment of an attorney of record free of charge to him. It is also obvious that Berryhill did not mention such indigency; and, by his actions in leaving the court

prematurely in March of 1985, he waived any possible indigency hearing or any possible right to a court-appointed attorney.

I would vote to deny the writ of habeas corpus.